IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON VICINAGE

RECEIVED

FEB 1 1 2008

AT 8:30_____M
WILLIAM T. WALSH
CLERK

|  |  |  |
|---|---|---|
| TAMEIKA SMITH, et al. | : | |
| | : | |
| Plaintiff(s), | : | |
| | : | Civil No. 03-5519(JAP/TJB) |
| -vs- | : | |
| | : | |
| CHS., INC., et al., | : | |
| | : | JOINT FINAL |
| Defendant(s). | : | PRETRIAL ORDER |
| | : | |

This matter having come before the Court for a pretrial conference pursuant to F.R.C.P. 16; and Paul D. Brandes, Esquire having appeared for plaintiff, Tameika Smith, individually and as the parent and natural guardian of Sincere Smith, a minor; Thomas M. Walsh, Esquire having appeared for defendants, CHS, Inc., Capital Health System at Mercer, Michelle Doohaluk, R.N. (a/k/a defendant, "M. Doohala"), Kristen McGinnis, R.N., Denise Richardson, R.N.C., and Chris Cameron-Tini, R.N. (a/k/a defendant, "Jane Roe Nurse # 1"); and Dorothy Donnelly, Esquire and co-counsel Charles C. Daley, Esquire having appeared for defendant, United States of America; the following Final Pretrial Order is hereby entered:

1. **JURISDICTION** *(set forth specifically).*

Jurisdiction in the United States District Court for the District of New Jersey is founded under 28 U.S.C. §1346 (b)(1), given this matter includes a civil action and claim against the United States seeking money damages for personal injury and death.

2. **PENDING/CONTEMPLATED MOTIONS** *(Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar.*

1

*Also, set forth the nature of the motion and the return date.  If the Court indicated that*

*it would rule on any matter at pretrial, summarize that matter and each party's*

*position).*

### A.    Plaintiff's Contemplated Motions:

1.    *Motion to correct the caption of the action to fully identify defendant,
Jane Roe Nurse # 1 as C. Cameron-Tini, R.N. and defendant, M.
Doohala as Michelle Doohaluk, R.N.*

*ORDER ENTERED BY USMJ ON 2/7/08*

On January 16, 2008, Plaintiff forwarded a proposed stipulation to defendants to

correct the case caption to correct defendant, "Jane Roe Nurse #1" to "Chris Cameron-

Tini, R.N." and defendant, Nurse "Doohala" to "Michelle Doohaluk, R.N."  The

Stipulation remains outstanding as of the date of this filing, but counsel for the subject

defendants advised plaintiff's counsel that he will sign the Stipulation.  Absent a

completed Stipulation, a Motion would have to be filed.

2.    *Motion to preclude Dr. Charles Brill, the neurology expert proffered by
defendants, CHS, Inc., Capital Health System at Mercer, Michelle
Doohaluk, R.N., Kristen McGinnis, R.N., Denise Richardson, R.N.C.,
and Chris Cameron-Tini, R.N., and any similar expert proffered by the
United States, from expressing opinions concerning the expected life
expectancy of Sincere Smith, a minor, including via Daubert/Frye
Motion and Motion in Limine.*

*File by 2/20/08    opposition 2/25/08    No reply*

These experts' opinions on life expectancy are not opinions but rather adoptions

and improper expressions of the opinions of others who are not witnesses in the case.

The opinions of those other, non-testifying witnesses have been discredited on

numerous occasions in other courts.  Moreover, the subject opinions expressed by the

experts in this case are not based on sound nor accepted methodology and as expressed

are speculative at best.

3.    *Motion in limine to preclude evidence, testimony and argument
regarding Ms. Smith's alleged prior and subsequent pregnancy history*

*File by 2/20/08    2    opposition 2/25/08    No reply*

Some time after Sincere Smith was born, Ms. Smith again became pregnant. She chose to terminate that pregnancy.  Also, defendant, Henry J. Austin's OB clinic records regarding Ms. Smith's pregnancy with Sincere note that Ms. Smith allegedly had a prior pregnancy history of a miscarriage and/or abortion.  However, Ms. Smith was never pregnant before her pregnancy with her son, Sincere.  Ms. Smith's alleged prior and subsequent pregnancy histories are irrelevant to any matter at issue in this case, and would only serve to confuse issues and potentially motivate the jury to reach a determination on improper grounds.  Moreover, if the issue was submitted in evidence the danger of unfair prejudice to plaintiff would substantially outweigh any alleged probative value.

4.    *Motion in limine to preclude evidence, testimony and argument regarding difficulties experienced by Ms. Smith in her relationship with Sincere's father.*

TRIAL BRIEF   2/20/08

During Ms. Smith's pregnancy with Sincere, she had disagreements and arguments with the father of her son.  Some of these arguments occurred in the Henry J. Austin OB clinic and were noted in the clinic medical chart.  Such incidents – whether noted in records or not – are irrelevant to any matter at issue in this case, and would only serve to confuse issues and potentially motivate the jury to reach a determination on improper grounds.  Moreover, if the issue was submitted in evidence the danger of unfair prejudice to plaintiff would substantially outweigh any alleged probative value.

5.    *Motion in limine to preclude evidence, testimony and argument concerning Ms. Smith's participation in and/or referral to anger management counseling before the birth of Sincere Smith.*

TRIAL BRIEF   2/20/08

Such participation or referrals are irrelevant to any matter at issue in this case, and would only serve to confuse issues and potentially motivate the jury to reach a

3

determination on improper grounds.  Moreover, if the issue was submitted in evidence

the danger of unfair prejudice to plaintiff would substantially outweigh any alleged

probative value.

6.      Motion *in limine* to preclude evidence, testimony and argument
        concerning Ms. Smith's father's receipt of disability income or payments
        regarding his own medical or personal issues.

TRIAL  BRIEF      2/20/08

This is irrelevant to any matter at issue in this case, and would only serve to

confuse issues and potentially motivate the jury to reach a determination on improper

grounds.  Moreover, if the issue was submitted in evidence the danger of unfair

prejudice to plaintiff would substantially outweigh any alleged probative value.

7.      Motion *in limine* to preclude evidence, testimony and argument
        concerning Ms. Smith receiving any public assistance benefits before the
        birth of Sincere Smith.

TRIAL  BRIEF      2/20/08

This is irrelevant to any matter at issue in this case, and would only serve to

confuse issues and potentially motivate the jury to reach a determination on improper

grounds.  Moreover, if the issue was submitted in evidence the danger of unfair

prejudice to plaintiff would substantially outweigh any alleged probative value.

8.      Motion to submit placental pathology expert report out of time.

GRANTED : REPORT BY 2/8/08 ; SLIDES TO CHS BY 2/11/08 & BY

During the course of discovery, plaintiff requested that defendant-hospital  2/13/08 TO USA

produce the placental pathology slides from the subject pregnancy.  Defendant reported  DEPENDANTS'

the slides could not be found and were presumed lost.  In mid-January, 2008, counsel  REPORTS

for defendant-hospital reported that the hospital found the slides and would produce  DUE

them to plaintiff's counsel for expert review.  The slides were produced to plaintiff's  2/18/08

counsel on January 18, 2008, and plaintiff's counsel in turn promptly sent them to a

placental pathology expert, Cynthia Kaplan, M.D. in New York.  Dr. Kaplan agreed to

ANY SUBSTANTIVE OBJECTIONS BY 2/20/08

4

OPPOSITION 2/25/08

NO REPLY

perform a preliminary review of the slides, as she was about to leave for a vacation. Dr.

Kaplan performed the preliminary review and provided a preliminary oral report of her

findings to plaintiff's counsel on January 25, 2008. Dr. Kaplan will not be able to

provide her written report until on or about February 4, 2008, as she is on a prepaid

vacation and does not return to her office until February 4th.

9. *Motion to preclude counsel for Dr. Murage from making arguments and questioning witnesses at the time of trial.*

*FILE BY 2/20/08   OPPOSITION 2/25/08 No REPLY*

Dr. Murage is not a defendant in this case. The United States was substituted

into the case as a defendant in the place of Dr. Murage (among other prior defendants).

While the doctor has private counsel who is assisting the United States in the litigation

of this case, the doctor has no standing as a party in this case. Consequently, she (on

her own or through counsel) has no right to be "heard" or to otherwise participate in the

trial of this matter other than as a witness.

**B.     Defendants, Capital Health System at Mercer (Incorrectly Impleaded as CHS, Inc. – Mercer Campus and/or d/b/a Capital Health System at Mercer), Michele Doohaluk, RN (Incorrectly Impleaded as M. Doohala, RN), Kristen McGinnis, RN, Chris Cameron-Tini, RN (Impeaded as Jane Roe Nurse #1) and Denise Richardson, RN's Contemplated Motions:**

1. *Motion to submit placental pathology expert report out of time.*

*GRANTED : SEE A 8 pg 4*

Plaintiff has requested that his placental pathology expert, Cynthia Kaplan,

M.D., be permitted to supply a report out of time. Defendant Nurses Richardson,

Doohaluk, McGinnis and Cameron-Tini request permission to submit a report after

receipt of Cynthia Kaplan, M.D.'s expert report. It is requested that plaintiff's counsel

return the original slides for examination by defendant's expert as soon as feasible so

that such reciprocal examination by defense expert and report can be issued.

2.   *Motion to permit the jury to make a determination as to the negligence of Dr. Murage and to her percentage share of negligence as compared to that of the defendant nurses and Capital Health System.*

FILE    2/20/08        OPPOSITION    2/25/08

Although plaintiff's claims against the United States fall under the Federal Tort Claims Act, in order to preserve and protect the legal rights of Nurses Richardson, Doohaluk, McGinnis and Cameron-Tini, a jury should determine the percentage share of negligence attributable to these nurse defendants in the event the jury should find them negligent. In order to do so, the jury must consider whether, in its determination, Dr. Murage was negligent and what percentage share of negligence is attributable to Dr. Murage as compared to the defendant nurses. Such a determination by the jury is the only mechanism by which the statutory and common law rights of the defendant nurses can be preserved. Such a determination of Dr. Murage's negligence and percentage share of negligence is fully appropriate and warranted under Rule 39(c) which vests the trial judge with the discretion to utilize an advisory jury under circumstances as presented herein. In Hamm v Nasatka Barriers, Inc., 166 F.R.D. 1, 2 (D.D.C. 1996), the United States District Court of the District of Columbia determined that it would be appropriate and necessary to make use of an advisory jury even though the claims were brought against the United States under the Federal Tort Claims Act. Where the same jury would already be hearing the claims against the non-governmental defendants, where the witnesses and factual underpinnings of the claims against the non-governmental defendants and those against the government are sufficiently intertwined and, importantly, where an advisory verdict will lessen the chances of an excessive damages award against the non-governmental defendants as might occur if the jury was precluded from considering the government's liability the Court exercises appropriate

6

and needed discretion in permitting the jury to render a verdict as to the United States. Id. at 3. See also, 9 Wright and Miller, Federal Practice and Procedure, Section 2335. Such a finding by the jury in this case would allow it to properly and without risk of undue confusion assess the comparative negligence roles of the defendant nurses and Dr. Murage and ensure a fair and just verdict. Such a finding under Rule 39(c) are purely advisory and, obviously, not binding upon the Court and the Court retains its obligation under the Federal Tort Claims Act to make its own findings of fact and law as to the United States.

3. *Motion to preclude the United States from reliance upon the following witnesses produced by defendant Hospital and Nurses: Thomas Wiswell, M.D., Robert Zimmerman, M.D., Gerald Raymond, M.D., Thomas Westover, M.D. and Charles B. Brill, M.D.*

FILE BY 2/20/08   OPPOSITION 2/25/08 NO REPLY

The above noted defendants produced these expert witnesses and should retain exclusive control and right to call said witnesses at the time of trial.

ADDRESS AT TRIAL IF WARRANTED

4. *Motion in Limine to Bar testimony of Plaintiff's expert, Michelle Murray, PhD, RNC, beyond her scope of expertise as set forth under Section 8B of this Pre-Trial Order.*

5. *Motion to preclude the testimony of Plaintiff's expert, Stephen Jones, M.D. beyond the scope of his expert qualifications as set forth in Section 8B of this Pre-Trial Order.*

6. *Motion in Limine to preclude the testimony of Plaintiff's expert, Marcus Hermansen, M.D. beyond the scope of his qualifications as set forth in Section 8B of this Pre-Trial Order.*

7. *Motion in Limine to bar the testimony of Plaintiff's expert, Daniel Adler, M.D. beyond the scope of his qualifications as set forth in Section 8B of this Pre-Trial Order.*

**C.   Defendant, United States of America on behalf of Julene Murage, M.D. Contemplated Motions:**

1. *Dr. Murage joins in the request of counsel for additional time to submit expert reports, including but not limited to a placental pathology report.*

PATHOLOGY REPORT : GRANTED  SEE A8 p94
ALL OTHER REPORTS : DENIED (OUT OF TIME/
VIOLATES DISCOVERY ORDER)

2.    *Dr. Murage joins in the motions submitted by the United States of America and co-defendants.*

**D.**    **Defendant, United States of America on behalf of Karen Saroya, L. Miccio and Henry J. Austin Contemplated Motions:**

1.    *The United States has filed two motions for partial summary judgment. The first on Counts III and V of the Amended Complaint with regard to Henry J. Austin Center, K.Saroya and L. Miccio.. The return date is February 19, 2008.*   *FILED - PENDING*

2.    *The United States has separately moved for partial summary judgment on Count VI of the complaint for all US defendants.*   *FILED - PENDING*

3.    *The United States will move for partial summary judgment on the complaint of Plaintiff Tameika Smith for any injuries caused to her by medical malpractice. No medical report provided by Plaintiffs substantiates that Tameika Smith suffered any physical or mental injury as a result of malpractice. Further, Plaintiff Tameika Smith failed to answer interrogatories related to her own claims for injury as a result of malpractice.*   *FILE 2/20/08   OPPOSITION 2/25/08   NO REPLY*

4.    *The United States will move for relief from the scheduling and final pretrial order to produce additional expert reports including Dr. Quartell who will rebut the co-defendant's expert reports; Dr. David Crawford, an economist; and a placental pathologist if plaintiff and co-defendant are permitted to provide such a report. : GRANTED SEE A8 p9 4]*   *DENIED*   *FILED - 2/7/08*

5.    *The United States will move to consolidate its complaint for contribution against Tameika Smith with this case.*   *DENIED*

6.    ***Motion in Limine*** *to bar plaintiff from referring to "defendants" without naming each defendant. The use of the term defendants in a multiparty case prejudices each separate defendant.*   *PLAINTIFF HAS NO INTENTION OF GROUPING AS "DEFENDANTS"*

7.    ***Motion in Limine*** *to bar Plaintiff Tameika Smith from testifying about her lost wages. Ms. Smith did not provide answers to interrogatories or requests for production of documents related to these claims. Plaintiff Tameika Smith presented no expert report on her lost wages.*   *FILE BRIEF 2/20/08   OPPOSITION 2/25/08   NO REPLY*

8.    ***Motion in Limine*** *to require plaintiff to provide current treatment records for Sincere Smith and to allow defendant to amend its exhibit list if necessary.*   *DENIED*

9.    ***Motion in Limine*** *to subtract from the Medicaid lien benefits for routine pediatric services.*   *TRIAL BRIEF 2/20/08*

10. *The United States will move to structure the award on behalf of Sincere Smith.* POST TRIAL IF WARRANTED

11. **Motion in Limine** *to bar the following persons from testifying about causation permanency or prognosis regarding Sincere Smith since no expert reports were provided, and to requirePlaintiff to comply with regulatory procedures for obtaining government witnesses.*
FILE 2/20/08   OPPOSITION 2/25/08   NO REPLY
Sandra Benanti, M.D.
Henry J. Austin Health Center
321 No. Warren St.
Trenton, N.J. 08618

12. **Motion in Limine** *to bar the following persons from testifying about causation permanency or prognosis regarding Sincere Smith since no expert reports were provided:*
FILE 2/20/08   OPPOSITION 2/25/08   NO REPLY
Barry N. Wasserman, M.D.
Campus Eye Group
1700 Whitehorse-Hamilton Square Road
Trenton, NJ 08690

Representative(s) of Visiting Nurse Association of Mercer County
171 Jersey Street, Suite 201
P.O. Box 441
Trenton, NJ 08603

Jan B. Wallack, M.D.
Robert Wood Johnson Medical School
1 Robert Wood Johnson Place
New Brunswick, NJ 08903

Thomas A. Rugino, M.D.
Children's Specialized Hospital
94 Stevens Road
Toms River, NJ 08753

Yen P. Chen, M.D.
Robert Wood Johnson University Hospital
125 Paterson Street, 6th floor
New Brunswick, NJ 08901

Elizabeth Rose, M.D.
Newark Beth Israel Medical Center

9

Children's Hospital
201 Lyons Avenue at Osborne Terrace
Newark, NJ 0712

JenFu Cheng, M.D.
Children's Specialized Hospital
94 Stevens Road
Toms River, NJ 08753

Lois Sternberg, ST
Visting Nurse Association of Mercer County
171 Jersey Street
P.O. Box 441
Trenton, NJ 08603

13.   *The United States joins with co-defendants in other motions identified by
them.*

**3. STIPULATION OF FACTS** *(Set forth in narrative form a comprehensive listing of
all uncontested facts, including all answers to interrogatories and admissions, to which
there is agreement among parties).*

None.

**4. PLAINTIFF'S CONTESTED FACTS** *(State separately for each plaintiff. Proofs
shall be limited at trial to the matters set forth below. Failure to set forth any matter
shall be deemed a waiver thereof).*

**A. Plaintiff intends to prove the following contested facts with regard to liability:**

This is an obstetrics medical malpractice and associated corporate negligence
case arising from medical and nursing care provided to plaintiff-mother, Tameika
Smith, during her pregnancy with her son, Sincere Smith.

On or about January 2, 2001, Tameika Smith, then 19 years old, began receiving
pre-natal obstetric care from the defendants for her pregnancy with Sincere Smith
("Baby Sincere"). Defendants initially determined that Ms. Smith was approximately

10 weeks pregnant with an estimated delivery date of July 29, 2001, that her pre-pregnancy weight was 130 pounds, that her blood pressure at the visit was 112/66 and that she had a family history of hypertension.  Thereafter, Ms. Smith returned to her care providers for regular prenatal visits, and was also seen in defendant-hospital's OB triage unit on May 29, 2001, June 17, 2001 and June 23, 2001.

At Ms. Smith's last several prenatal visits, the defendants noted her blood pressure was elevated, she gained more weight than average and her fundal height was less than the estimated gestational age of the fetus.  On or about May 29, 2001 at approximately 9:20 p.m., Ms. Smith presented to the defendant Hospital complaining of, among other things, back pain, vaginal pressure and cramping, at which time her care was observed, managed and/or provided by defendants. Thereafter, at 9:40 p.m., Ms. Smith was examined, wherein defendants noted that Ms. Smith's cervix was closed, membranes were intact, she had no tingling, numbness, pain or swelling in her hands, she was having mild contractions and her blood pressure was 117/73. At this time, Baby Smith's fetal heart rate was monitored and noted to be reactive.  At approximately 11:45 p.m., defendants discharged Ms. Smith following diagnoses of bacterial vaginosis, and interpreting her blood pressure, fetal monitoring and other laboratory results as normal.

During Ms. Smith's prenatal visit of June 14, 2001, the defendant care providers noted that fetal heart rate and movement were present, Ms. Smith weighed 170 ½ pounds and further noted "pelvic + 2 cm." Thereafter, on or about June 17, 2001 at approximately 1:30 pm., Ms. Smith presented to the defendant Hospital complaining of,

among other things, sharp pain that comes and goes, at which time her care was observed, managed and/or provided by defendants.

At that time, defendant Hospital nurses examined Ms. Smith and monitored the fetal heart rate and, noted the fetal heart rate was reactive, Ms. Smith's cervix was closed, membranes were intact, she was having mild contractions every 2 to 3 minutes, had swelling and tingling in her right hand, and her blood pressure was 136/90 at 1:45 p.m., 119/78 at 2:30 p.m. and 125/84 at 3:00 p.m. The defendants diagnosed Ms. Smith as being in pre-term labor and ordered Brethine 0.25 mg to be administered to her at 2:10 p.m. and again in a half hour if needed.  At approximately 4:15 p.m., the defendants interpreted Ms. Smith's blood pressure, fetal monitoring and other laboratory results as normal and discharged her from the hospital after determining that her contractions had stopped at approximately 4:00 p.m.

On June 23, 2001, Ms. Smith presented to the defendant, Hospital, complaining of, among other things, low abdominal pain, shortness of breath, and swelling. Following examination, the defendants noted the fetal heart tones were reactive, Ms. Smith's cervix was closed, membranes were intact, she was having contractions, and her blood pressure was 158/90 at 9:35 p.m. and 135/80 at 10:05 p.m., which was repeated with the patient in the left lateral position with a reading of 121/73.

At approximately 11:55 p.m., the defendants diagnosed Ms. Smith as being in pre-term labor and discharged her from the hospital after interpreting her fetal monitoring, blood pressures and lab results as normal.

On July 5, 2001 at approximately 3:15 p.m., Ms. Smith (then approximately 36 4/7 weeks gestation), presented to defendant Hospital via the labor and delivery triage

12

unit.  At that time, defendants, Dr. Murage, Nurse Cameron-Tini, Nurse Doohalak,

Nurse McGinnis, Nurse Richardson, Hospital, and/or United States of America[1], all of

whom had notice of Ms. Smith's medical history relating to this pregnancy, observed,

managed and/or provided care to Ms. Smith in person or by telephone.

Upon her arrival, defendants noted that Ms. Smith had complaints of, among

other things, "flu-like symptoms," nausea, vomiting, headache, swelling of her face and

extremities, and right hand edema with the inability to grasp with her hand.  A collected

urine specimen tested positive for +4 protein.  Fetal monitoring was noted by Nurse

Cameron-Tini to demonstrate decreased fetal heart rate variability, variable

decelerations and few if any contractions.  The nurse did not perform a pelvic

examination nor other physical examination to assess or determine cervical, uterine and

fetal status.  Ms. Smith's blood pressures were noted by the nurse to be 152/107,

152/106 and 161/101 shortly after arrival.

At 3:30 p.m., defendant Dr. Murage, Ms. Smith's attending obstetrician, was

paged by Nurse Cameron-Tini.  The doctor returned the page, either from her office or

from her home.  The doctor was made aware of Ms. Smith's arrival at the hospital

together with the aforenoted signs, symptoms and findings.  Dr. Murage determined

that Ms. Smith had preclampsia, ordered that she be administered Magnesium Sulfate

(for seizure precautions) and ordered that Ms. Smith be admitted to the hospital for

observation as opposed to prompt delivery.  In a second phone call shortly thereafter

between defendant, Nurse Richardson (the OB charge nurse that day) and Dr. Murage,

---

[1] Defendant, United States of America, was substituted as a defendant for the previously
named defendants, Henry J. Austin Health Center, Inc., Julene O. Murage, M.D., Karen
Saroya, C.N.M., and Leanne Miccio, C.N.M., who were identified in the Complaint.

the doctor ordered that the patient be administered Hydrazaline to bring down the blood pressure.

At about 3:40 p.m., the defendants formally admitted Ms. Smith to the hospital's antepartum unit (as opposed to a labor/delivery room), though Ms. Smith was not actually transferred to her patient room at that time. The Magnesium Sulfate was started, and electronic fetal monitoring continued. It is questionable whether Hydrazaline was administered. There was a subsequent "hold" order allegedly issued by Dr. Murage in a third telephone conversation, but other hospital records indicate the medication was actually administered. The hold order was written by defendant, Nurse Cameron-Tini, indicating she had the conversation with Dr. Murage.

According to Dr. Murage, despite the patients' (mother and unborn baby) reported conditions and status, she had no intention of coming to the hospital to see and examine them for at least another one to two hours. She claims that based on the reports of the nurses, she interpreted the patients' conditions as stable and not in need of immediate medical attention, including expedited delivery. However, Nurse Richardson testified that she called Dr. Murage at her office at about 4:00 p.m. and advised the doctor that the fetal monitoring was non-reassuring and that she felt the doctor needed to get to the hospital immediately to deliver the baby. Dr. Murage claims this conversation never took place. Nevertheless, according to Nurse Richardson, Dr. Murage told her to get Ms. Smith ready for a C-Section. A C-section consent form was signed by the patient, but it is not timed. Additionally, Dr. Murage did not arrange for another obstetrician to manage Ms. Smith's care, even though the only treatment for

14

severe preeclampsia is rapid delivery and Dr. Murage was either at her office or at home at the time.

Nurse Richardson also testified that she subsequently instructed Nurse Cameron-Tini to again call Dr. Murage because the doctor had not come to the hospital and to reiterate that the doctor needed to get to the hospital to tend to Ms. Smith and deliver the baby. Nurse Richardson testified that Nurse Cameron-Tini did place the call and did speak with the doctor, as she overheard the conversation. Dr. Murage also claims this conversation never occurred.

According to Dr. Murage, during the initial telephone conversations shortly after the patient's arrival to the hospital, the nurses gave the doctor the wrong information regarding what was seen on the fetal monitor tracing. Dr. Murage later interpreted the tracing as showing late decelerations. Dr. Murage testified at deposition that had the nurses advised her of this during the telephone calls, she would immediately have come to the hospital and delivered Sincere Smith rather than stay at home or at her office.

Upon admission, defendants monitored Ms. Smith's contractions and fetal heart rate, and ordered blood studies. The blood test results were later reviewed and determined to be abnormal and consistent with preclampsia.

Between approximately 3:30 p.m. and 4:00 p.m., while acceleration of the fetal heart rate was present, the fetal heart rate tracings were noted as non-reassuring with decelerations and decreased long term variability, there was poor pick up of contractions, and decreased fetal movement was also noted, about which the care providers were aware but failed to properly act upon. During this time, Ms. Smith's

blood pressure continued to be significantly abnormal, about which the defendants were aware but failed to properly act upon.

At approximately 4:05 p.m., Dr. Tatarowicz was asked by a nurse – per hospital protocol -- to administer the Hydrazaline to Ms. Smith, given Dr. Murage's initial order. However, according to Dr. Tatarowicz, upon his arrival he was told he was not needed. Nursing notes indicate, however, that he did see the patient. Nursing notes also indicate the Hydrazaline was held by order of Dr. Murage.

Between approximately 4:00 p.m. and 5:20 p.m., the fetal heart rate tracings did not adequately record the fetal heart rate and contractions, but nurses' flow sheet entries during this time by Nurse Cameron-Tini and Nurse Doohalak indicate that fetal heart rate tracings demonstrated decelerations and decreased long term variability, and decreased fetal movement starting at about 4:45 p.m., about which the defendants were aware but failed to properly act upon.

At about 5:00 p.m., Ms. Smith was transferred from the triage unit to her observation room on the hospital's antenatal unit. There, she was observed just periodically by Nurse Doohalak, who only made intermittent chart entries, contrary to hospital policy and procedure.

Between approximately 4:45 p.m. and 6:15 p.m., the defendants did not perform proper nor sufficient assessments, examinations or testing of Ms. Smith or her baby, despite fetal heart rate tracings during that time period demonstrating concerning and worsening patterns, about which the defendants were aware but failed to properly act upon. Notwithstanding, Dr. Murage never came to the hospital.

Further, as stated by Nurse Richardson during her deposition concerning the fetal and maternal status while Ms. Smith was still in the triage unit, "The fetal heart had very little variability and I thought it had gone on long enough;" "And enough phone calls had been made about the strip, and Dr. Murage needed to see her and the strip;" "I felt like the baby needed to be delivered." Regardless of these thoughts, at no time did Nurse Richardson or the other defendant nurses, such as Nurse Cameron-Tini and Nurse Doohaluk, take it upon themselves to call for the assistance of another obstetrician to deliver Sincere Smith.

At approximately 6:20 p.m., defendant Nurse Doohaluk administered oxygen to Ms. Smith. Between approximately 6:15 p.m. through 6:58 p.m., the concerning fetal heart rate patterns continued with the baseline beginning to trend dangerously downward from the 130s to the 90s, about which the defendants were aware but failed to properly act upon. During this time frame, Ms. Smith's blood pressure continued to be significantly abnormal, about which her care providers were aware but failed to properly act upon.

At approximately 6:45 p.m., defendant Dr. Murage was again contacted about the abnormal fetal heart rate. By this time, the doctor was finally in her car to come to the hospital for what she claims was a routine evaluation of the mother and unborn baby. This was some three hours after Dr. Murage was first called by Nurse Cameron-Tini upon the patient's arrival to the hospital. According to Dr. Murage, she believed Ms. Smith and her baby were both stable and in no immediate danger based on what she heard earlier from the nurses by telephone. Between approximately 6:45 p.m. and 6:58 p.m., Dr Murage finally arrived at the hospital.   Thereafter, defendants made the

17

decision to perform a stat cesarean section delivery of Ms. Smith's baby. There is no fetal heart tracing from approximately 6:58 p.m. through the time of delivery by defendants at 7:12 p.m., though it is clear that Baby Sincere exhibited signs of persistent bradycardia.

Baby Sincere Smith was delivered by the defendants via cesarean section from a transverse lie at approximately 7:12 p.m. on July 5, 2001, and was noted to be asystolic, flaccid and cyanotic with APGAR scores noted by defendants of 1 at one minute, 4 at five minutes and 6 at ten minutes, though there is no documentation of the specific scoring for Sincere's heart rate, respiration, tone, reflexes or color at any of the aforementioned time intervals. Following delivery, Baby Sincere was resuscitated and was transferred to the Hospital's NICU where he remained until approximately July 27, 2001, during which time he evidenced signs of severe brain damage due to oxygen deprivation during labor and delivery. Baby Sincere suffered seizures within the first days of life, hypoxic ischemic encephalopathy and multi-system organ injury.

Following delivery of Baby Sincere, defendant Dr. Murage ordered umbilical cord blood pH testing which was reported as 6.78 (highly abnormal and indicating severe metabolic acidosis due to lack of oxygen) with a base excess of minus 19.7, a further sign of severe metabolic acidosis. Dr. Murage also noted that the placenta separated spontaneously and contained multiple layers of dark organized clots which she felt was consistent with an acute abruption due to Ms. Smith's persistent high blood pressure while in the hospital.

**B. Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).**

As a direct result of the asserted negligence of the defendants, Ms. Smith's pregnancy induced hypertension and/or preeclampsia, labor and concerning fetal heart monitor tracings were not timely assessed, diagnosed and treated, resulting in severe and debilitating injuries to Baby Sincere shortly before he was eventually delivered by the defendants.

Baby Sincere, now six years of age, suffers from global developmental delay, including cerebral palsy, cannot ambulate, feed himself, sit unassisted, talk, care for himself nor engage in usual activities of daily living.

According to plaintiff's neurology expert, Daniel Adler, M.D., and plaintiff's life care planning expert, Terri Patterson, R.N., M.S.N., Sincere will require life time and constant care, supervision and assistance in all activities of daily living. Accordingly, Nurse Patterson estimates that the total cost to care for Sincere is:

*Pediatric Years (through 21 years of age)*

    a. If he is cared for at home: $3,093,422.00
    b. If he is cared for in a residential placement facility: $4,383,992.00

*Adult Years (through life expectancy)*

    a. If he is cared for at home with supportive services:  $221,830.00 per year, plus a one time cost of $85,320.00
    b. If he is cared for at a residential placement facility: $202,540.00 per year

Plaintiff's economic experts, Andrew G. and Andrew C. Verzilli, Ph.D./M.B.A., evaluated Nurse Patterson's projections and reduced them to present value. Accordingly, the future care costs amount to the following:

> a. *If Sincere is cared for at home*:
>
> $6,734,624.00 to $10,486,744.00
>
> b. *If Sincere is cared for in a residential placement facility*:
>
> $7,341,822.00 to $10,922,204.00

Plaintiff's economic experts also valued Sincere's lost earning capacity given his inability ever to be employable in the labor market. In assessing that loss, the economists took into strong consideration the background of Ms. Smith. Ms. Smith is a high school graduate and completed employment/training as a Teacher's Assistant through Americorp. Ms. Smith was unable to return to work as a teacher's assistant following the birth of Sincere due to his specialized care and supervision needs. According to the experts, Sincere's lost earning capacity is approximated to be:

> a. *Assuming a high school diploma*:
>
> 686,300.00 to $1,157,900.00
>
> b. *Assuming a bachelor's degree*:
>
> $1,059,500.00 to $1,826,400.00

Plaintiff also seeks the following damages:

> a. Past and future care, treatment and living expenses for Sincere;
> 4 MEDICAID LIEN AS OF 1/2/08 : #223,469.88
>
> b. Ms. Smith's past and future lost wages and loss of earning capacity, as she cannot maintain a job and care for Sincere (she did attempt to return to the labor force via a job at the Learning

20

Depot, but could not maintain the job given Sincere's substantial

needs);

c.     Ms. Smith's past and future pain, suffering, distress, anxiety, loss

of life's pleasures and the like relating to her negligent infliction

of emotional distress claim and negligently treated preeclampsia;

d.     Sincere's past and future loss of enjoyment of life;

e.     Sincere's past and future pain, suffering, distress, frustration,

anxiety, disabilities, and the like;

f.     Sincere's disfigurement, embarrassment and humiliation.

## 5. DEFENDANT'S CONTESTED FACTS *(State separately for each defendant. See instructions above).*

**Defendants, Capital Health System at Mercer (Incorrectly Impleaded as CHS, Inc. – Mercer Campus and/or d/b/a Capital Health System at Mercer), Michele Doohaluk, RN (Incorrectly Impleaded as M. Doohala, RN), Kristen McGinnis, RN, Chris Cameron-Tini (Impeaded as Jane Roe Nurse #1) and Denise Richardson, RN's Contested Facts:**

### A. Defendants intend to prove the following contested facts with regard to liability:

Tameika Smith appeared for unscheduled treatment at Capital Health System on

May 29, 2001, June 14, 2001 and June 23, 2001. On each occasion, she was advised to

contact the Henry J. Austin Clinic to schedule follow-up prenatal examinations. On

June 17, 2001 and June 23, 2001, Tameika Smith was advised by nursing staff to

follow-up with prenatal examinations at the Henry J. Austin Clinic. She was advised to

advise her physicians should she notice any decreased fetal movement. She was

advised on these dates to contact her physicians or seek out medical care should she

21

experience any symptoms related to pregnancy induced hypertension, including swelling, headache, decreased fetal movement or if she felt ill. Tameika Smith failed to present herself to the Henry J. Austin Clinic on June 22, 2001 and June 29, 2001 for scheduled prenatal examinations. Tameika Smith sought no treatment between June 23, 2001 and 3:15 p.m. on July 5, 2001.

Plaintiff, Tameika Smith, was a 20-year old, gravida 3, para 0020 with an estimated date of confinement of July 29, 2001. Her prenatal care was complicated by non-compliance with several scheduled prenatal appointments and treatment recommendations, mild anemia, domestic disputes with the father of Sincere Smith, genital warts, evidence of chorioamnionitis and bacterial vaginosis. Her prenatal care was managed by Dr. Murage and Midwives Saroya and Miccio, each of whom were employees of the Henry J. Austin Center and employees of the United State of America. On May 29, 2001, Tameika Smith presented to Capital Health System for purposes of assessing possible preterm labor. Tameika Smith and fetal status was properly assessed by the attending nursing staff on that visit and the patient was also seen and discharged from the hospital by Midwife Saroya. Proper discharge instructions were given to the patient by both, Midwife Saroya and the attending nurse. The patient was instructed to follow-up with an appointment in the prenatal clinic at Henry J. Austin which had been scheduled for May 31, 2001. Tameika Smith had follow-up appointments in early June of 2001 and on June 14, 2001 at the Henry J. Austin clinic. Tameika Smith was scheduled to return to the clinic for a prenatal visit on June 22, 2001. She failed to appear at that scheduled appointment contrary to medical recommendations made to her. Tameika Smith was then scheduled for a follow-up appointment at the prenatal

22

clinic on June 29, 2001. Tameika Smith failed to appear for the June 29, 2001 appointment and thereby was non-compliant with the medical instructions given to her by the physicians and midwives at the Henry J. Austin Clinic. Tameika Smith's failure to appear for the follow-up appointments of June 22, 2001 and June 29, 2001 constituted negligent behavior which caused the neurologic injuries of which Sincere Smith currently suffers.

On June 17, 2001, Tameika Smith presented to Capital Health System and was assessed by Chris Ryan. Nurse Ryan appropriately assessed Tameika Smith and assessed fetal status and the patient was properly discharged after Dr. Fred Williams ordered that the patient should be discharged with instructions that the patient follow-up with the prenatal clinic at Henry J. Austin on Thursday, June 21, 2001. Tameika Smith was diagnosed with a urinary tract infection for which she received an antibiotic which was called to the pharmacy by Dr. Williams on her behalf. While being discharged from Capital Health System by Nurse Ryan, Tameika Smith was told to place a telephone call to the Henry J. Austin Clinic on Monday, June 18, 2001 and advise the Henry J. Austin Clinic of her appearance at the Capital Health System on Sunday, June 17, 2001. She was also advised that she had an appointment at the Henry J. Austin Clinic scheduled for June 22, 2001 and that she should keep this appointment or schedule an appointment to be seen sooner at the Henry J. Austin Clinic. Tameika Smith verbalized her understanding of these discharge instructions, was given written information setting forth these instructions and agreed to comply with these instructions. Tameika Smith failed to comply with these instructions and did not follow-up with the Henry J. Austin Clinic and failed to appear for any office visit on

June 22, 2001. This failure to follow the discharge instructions of Nurse Ryan and failure to keep the follow-up appointment at the Henry J. Austin Clinic caused the neurologic injuries currently suffered by Sincere Smith.

On June 23, 2001, Tameika Smith presented to Capital Health System complaining of abdominal pain. Tameika Smith and fetus status were properly evaluated by the nursing staff on June 23, 2001 and Tameika Smith spoke with Midwife Miccio on that date. Additionally, the discharge from the Capital Health System on June 23, 2001 was approved by Midwife Miccio. On that date, Tameika Smith was advised to follow-up with the Henry J. Austin Clinic on Monday, June 25, 2001 for an evaluation of maternal and fetal status. Tameika Smith failed to do so and such actions were negligent behavior which caused the neurologic injuries suffered by Sincere Smith. Additionally, Tameika Smith was advised by the nursing staff on June 23, 2001 that any decrease in fetal movement should be immediately reported to her physician or to one of the midwives at Henry J. Austin Clinic. From June 25, 2001 through July 5, 2001, Tameika Smith failed to comply with these instructions from her caregivers and such failure was negligence which caused the neurologic injury suffered by Sincere Smith. Specifically, Tameika Smith's failure to report decreased fetal movement, failure to report to the Henry J. Austin Center between June 25, 2001 and 3:15 p.m. on July 5, 2001 for evaluation of fetal status and maternal status caused the neurologic injuries suffered by Sincere Smith. To a reasonable degree of medical probability, Tameika Smith was experiencing hypertension and proteinemia on June 29, 2001 at which time she failed to appear for maternal and fetal evaluation and thereby prevented her treatment providers from rendering treatment which would have prevented the

injuries sustained by Sincere Smith. To a reasonable degree of medical probability, Sincere Smith suffered an asphyxial injury in the 24 to 48-hours prior to Tameika Smith's arrival at Capital Health System at 3:15 p.m. on July 5, 2001. To a reasonable degree of medical probability, a placental abruption occurred prior to Tameika Smith's arrival at the hospital on July 5, 2001 and such an event caused the neurologic injuries and impairments suffered by Sincere Smith currently. By reference and incorporation herein, defendant intends to prove each and every fact set forth in the expert reports of Thomas Westover, M.D. (dated January 8, 2008) and Jay Goldberg, M.D. (dated December 17, 2007). Such reports relate to the above mentioned contested facts and relate to the care and treatment rendered to the plaintiffs, Tameika Smith and Sincere Smith by Michelle Doohaluk, R.N., Denise Richardson, R.N., Christine Cameron-Tini, R.N., Christine Ryan, R.N., Karen McGinnis, R.N. and other healthcare providers including Dr. Murage. Defendant intends to prove that all nursing care rendered at Capital Health System was proper and within accepted standards of care on July 5, 2001 and during prior treatment encounters during June and May of 2001. Defendant will prove that Tameika Smith had signs and symptoms of severe pregnancy induced hypertension on July 4, 2001 and during the morning of July 5, 2001. After arrival at Capital Health System on July 5, 2001, proper assessment of maternal and fetal status was performed by Nurses Cameron-Tini, Richards and Doohaluk and proper communications of the patient's status were made to Dr. Murage. Lab work on July 5, 2001 showed a normal CBC except for mild anemia, normal liver function tests and normal creatinine, normal PT and PTT and normal electrolytes between 3:15 p.m. and 7:00 p.m. On July 5, 2001, the nursing staff properly implemented the orders of Dr.

Murage and communicated with Dr. Murage within the standard of care concerning the patient's status. Defendant intends to prove that nursing staff had several conversations with Dr. Murage in which they fully informed Dr. Murage concerning the patient's status and that Dr. Murage advised the nursing staff at 4:45 p.m. that she was coming to the hospital to evaluate the patient.

Defendant will prove that the nursing staff had no further duty to call any other available obstetricians under the circumstances of this case. Defendant intends to prove that Dr. Murage deviated from accepted standards of care by not properly advising the nurses that her arrival at the hospital would be delayed and for failing to comply with her duty to advise the nurses that her arrival would be delayed and improperly failed to instruct the nurses to seek out another OB/GYN to assume care of the patient. Defendant incorporates by reference herein the facts set forth in the expert reports of Thomas Wiswell, M.D. (dated January 13, 2008), Gerald Raymond, M.D. (dated January 14, 2008) and Robert Zimmerman, M.D. (dated January 11, 2008) to the extent such facts relate to issues of liability. Defendant will prove that the etiology of the injury to Sincere Smith was Tameika Smith's hypertension and preeclampsia and concealed placental abruption which occurred prior to arrival at the hospital on July 5, 2001. Defendant shall prove that the severe injury to this child most likely occurred between 24 and 48-hours prior to Tameika Smith's arrival at the hospital on July 5, 2001. Tameika Smith's clinical findings, such as headache, swelling, decreased fetal movement took days to develop prior to arrival at the hospital on July 5, 2001 and the hypoxic/ischemic injury to Sincere Smith's brain to a reasonable degree of medical probability took place at least 24 to 48-hours before his mother arrived at the hospital

26

on July 5, 2001. The fetal heart tracing of July 5, 2001 is evidence and a reflection of a preexisting brain injury to Sincere Smith which existed prior to arrival at the hospital on July 5, 2001. The ultrasound films of July 6, 2001 at 1:49 p.m. as well as the CT scans of July 9, 2001 and the subsequent ultrasounds of September 13, 2001 and the CT scan of October 26, 2001 establish to a reasonable degree of medical probability that a brain injury to Sincere Smith occurred between 24 to 48-hours prior to arrival of Tameika Smith at the hospital on July 5, 2001. Defendant will prove that even had immediate delivery been performed by Cesarean section or otherwise after arrival at the hospital on July 5, 2001, that is, by 3:15 p.m., Sincere Smith would have the same neurologic outcome and same neurologic injuries.

Christine Cameron-Tini, R.N. denies each and every opinion of deviation from standard of care set forth by Michelle Murray, R.N. and Dr. Steven Jones and to the contrary will prove that her care was within accepted standards of nursing practice. Michelle Doohaluk, R.N. denies each and every opinion of deviation from standard of care set forth by Michelle Murray, R.N. and Dr. Steven Jones and to the contrary will prove that her care was within accepted standards of nursing practice. Denise Richardson, R.N. denies each and every opinion of deviation from standard of care set forth by Michelle Murray, R.N. and Dr. Steven Jones and to the contrary will prove that her care was within accepted standards of nursing practice. Moreover, Defendant, Capital Health System denies any claim that it was negligent with respect to the care and treatment of Tameika Smith or Sincere Smith.

**B. The CHS Defendants intend to prove the following contested facts with regard to damages:**

With respect to damages, Defendant incorporates by reference all facts set forth in the reports of Charles B. Brill, M.D. (dated January 9, 2008 and January 23, 2008), report of Thomas Connolly (dated January 9, 2008 and as set forth in January 15, 2008 summary of Mr. Connolly's opinion), report of Robert Zimmerman, M.D. (dated January 11, 2008), report of Gerald Raymond, M.D. (dated January 14, 2008), report of Thomas Westover, M.D. (dated January 8, 2008) and report of Jay Goldberg, M.D. (dated December 17, 2007). Defendant intends to improve that all neurologic injuries and damages suffered by Sincere Smith occurred prior to Tameika Smith's arrival at the hospital on July 5, 2001. The factual basis of this contention includes: that a placental abruption occurred prior to Tameika Smith's arrival at Capital Health System on July 5, 2001, Tameika Smith's condition of severe pregnancy induced hypertension and preeclampsia preexisted her arrival at Capital on July 5, 2001, that the ultrasounds and other imaging studies of Sincere Smith's brain demonstrate an injury which preexisted Tameika Smith's arrival at Capital Health System on July 5, 2001, that the fetal monitor tracing demonstrates an injury to the brain of Sincere Smith which preexisted arrival at the hospital on July 5, 2001, that decreased fetal movements preexisted Tameika Smith's arrival at the hospital on July 5, 2001, that the infant, Sincere Smith, after delivery did not have hypotonia that persistent for 36-48 hours but was initially flaccid and within hours of birth, his tone was described as normal or increased, Sincere Smith's Apgar scores of 4 and 6, respectively, at 5 and 10 minutes reflect a child able to respond to resuscitative effort and are inconsistent with an acute brain injury occurring

28

just prior to birth, nucleated red blood cells measured reflect a brain injury to Sincere Smith prior to arrival at the hospital on July 5, 2001, Sincere Smith did not evidence classic multi-organ system failure such as to his kidneys which points to a brain injury occurring prior to 3:00 p.m. on July 5, 2001 and protein in Sincere Smith's urine reflect an injury prior to Tameika Smith's arrival at the hospital on July 5, 2001 and fetal tracings on July 5, 2001 are inconsistent with an alleged brain injury occurring between 3:15 p.m. and 7:00 p.m. Defendant will prove that because of Sincere Smith's injuries which preexisted his mother's arrival at the hospital on July 5, 2001 that Sincere Smith has a drastically reduced life expectancy which consists of a 50% life expectancy of between 5-10 years of additional years of life consistent with the data set forth in the journal articles "survival of profoundly disabled people with severe mental retardation" and "prognosis of survival and improvement in function in children with severe developmental disabilities" and "life expectancy of child with cerebral palsy" which were submitted in conjunction with Dr. Brill's expert reports and incorporated herein by reference. The basis for the decreased life expectancy includes the child's severe physical disabilities including inability to lift his head and inability to feed himself, inability to turn his head from side to side or roll over, inability to sit, inability to have head control, inability to perform spontaneous movements, cortical blindness, recurrent seizure activity, his status of minimal consciousness, and overall, brain impairment. Defendant will prove to a reasonable degree of economic certainty that the cost of funding the proposed life care plan as set forth by Nurses Patterson and Masterson can be funded through the purchases of annuities in the amounts of $3,982,659 (Alternative I of home care with supportive services) and $4,649,028 (Alternative II residential

29

placement). The factual basis is set forth in the report of Thomas Connolly and incorporated herein by reference. Defendants, Capital Health System, Nurses Richardson, Doohaluk, Cameron-Tini shall prove that their actions and care and treatment did not cause the injuries to Sincere Smith.

### Defendant, United States of America on behalf of Julene Murage, M.D. Contested Facts:

Initially, I would note that reference to Dr. Murage as a defendant in the case is improper as she is in fact not a defendant. As to contested facts, at least on behalf of Dr. Murage, I cannot agree with proposed submission of facts. Dr. Murage asserts she acted at all times within the standard of care required of her at the time and that nothing that she did caused the infant's claimed injuries. In short, I can therefore not stipulate to the proposed submissions of Plaintiff.

### Defendant United States on behalf of Karen Saroya, L. Miccio and Henry J. Austin Contested Facts:

The Plaintiff has set forth no contested facts with regard to the prenatal treatment of Tameika Smith at Henry J. Austin Health Center and by nurse midwives L. Miccio and K. Saroya. No expert opinion attests to medical malpractice or negligence by the center or the the nurse midwives.

Plaintiff throughout the pregnancy failed to follow directions regarding weight gain and failed to keep appointments on a timely basis.

On January 25, 2001 Tameika Smith failed an appointment with Dr. Murage for a colposcopy. A message was left for her to call and reschedule.

On February 1, 2001 another message was left for Tameika Smith and a letter sent.

She missed appointments with the Henry J. Austin Health Center on June 22 and 29th.

On February 22, 2001 Tameika finally went to the Center. Her blood pressure was 102/62. Notes indicate that Tameika was told the importance of follow up.

On March 2, 2001, plaintiff went to St. Francis Hospital emergency room with chief complaint of spotting. Plaintiff had been told that St. Francis had no delivery capacities and was further given the phone numbers of the center employees to call in an emergency.

Plaintiff's last visit at Henry J. Austin Health Center was June 14, 2001.

A fetal ultrasound was taken on June 26, 2001 at Mercer Medical center. The ultrasound noted no evidence of placenta previa. Fetal size was appropriate and growth between scans within normal limits.

All lab results prior to the day of delivery were normal..

On July 5, 2001 at approximately 3:15 p.m., Ms. Smith (then approximately 36 4/7 weeks gestation), presented to defendant Hospital via the labor and delivery triage unit.

At the time of her presentation she had been ill the previous day while partying for the 4th of July. She was tired, but stayed at the party until 8 p.m. She reported vomiting and headaches and diarrhea. She reported she had been exposed to others who had the flu.

Although ill, Tameika Smith failed to seek medical care in a timely fashion.

Her negligent failure to seek medical care resulted in prolonged high blood pressure and a rupture of the placenta causing the injuries to Sincere Smith prior to her presentation at the hospital.

On July 5 neither Karen Saroya or L. Miccio were at Capital Health System.

Neither Miccio or Saroya provided any medical advice on the care of Tameika Smith on July 5.

The nurses at Capital Health System failed to accurately read and understand the Fetal Heart Monitor print outs.

Accurate information was not conveyed to any employee of the United States by nurses in attendance at Capital Health Systems on July 5, 2001.

Between approximately 4:00 p.m. and 5:20 p.m., the fetal heart rate tracings did not adequately record the fetal heart rate and contractions, but nurses flow sheet entries during this time by Nurse Cameron-Tini and Nurse Doohalak indicate that fetal heart rate tracings demonstrated decelerations and decreased long term variability, and decreased fetal movement starting at about 4:45 p.m., but which information was not conveyed to any employee of the United States.

31

No nurse or doctor at Capital Health System requested any employee of the United States to appear at the hospital to deliver Tameika Smith's child until 1845 when an emergency situation was recognized.

The baby was delivered with apgars of 1, 4, and 5.  Cord gas was 6.7 and there were large multiple organized dark adherent clots to the placenta and uterus. Expert testimony will establish that these factors prove that the placenta was ruptured prior to Tameika Smith's arrival at the hospital.

The United States employees did not breach a standard of care that proximately caused injuries to Plaintiffs Tameika or Sincere Smith.
And the United States will prove that damages are not appropriately awarded to either Smith.

Other contested facts related to Dr. Murage will be provided by Charles Daley.

**6. PLAINTIFF'S WITNESSES** *(Aside from those called for impeachment purposes,*

*only those witnesses whose names and addresses are listed below will be permitted to*

*testify at trial).*

**A.  On liability, Plaintiff intends to call the following witnesses who will testify in**

**accordance with the following summaries:**

Tameika Smith (Plaintiff)
89 Sweets Street
Trenton, NJ 08618
(regarding the facts and circumstances identified above )

Lisa Bellamy (friend)
P.O. Box 743
Mooresville, N.C.28115
(regarding the facts and circumstances identified above)

Timothy Smith (relative)
132 Locust Street
Trenton, N.J. 08609
(regarding the facts and circumstances identified above)

Crystal Smith (relative)
132 Locust Street
Trenton, N.J. 08609
(regarding the facts and circumstances identified above)

Lois Sleming (friend)
132 Locust Street
Trenton, N.J. 08616
(regarding the facts and circumstances identified above)

Turquoise Jones (friend)
772 Pointe South Parkway, Apt. 1103
Jonesboro, GA 30238
(regarding the facts and circumstances identified above)

Channel Flowers (friend)
772 Pointe South Parkway, Apt. 1103
Jonesboro, GA 30238
(regarding the facts and circumstances identified above)

Michelle L. Murray, PhD, RNC (plaintiff's nursing and hospital liability expert)
9500 Montgomery NE, Suite 208
Albuquerque, New Mexico 87111
(regarding the negligence and causation opinions expressed in her report)

J. Stephen Jones, M.D. (plaintiff's obstetrics and hospital liability expert)
4235 Minnesota Lane North
Plymouth, MN 55446
(regarding the negligence and causation opinions expressed in his report)

Marcus C. Hermansen, M.D. (plaintiff's neonatology expert)
14 Gregg Road
Nashua, NH 03062
(regarding the causation opinions expressed in his report)

Daniel Adler, M.D., L.L.C. (plaintiff's pediatric neurology expert)
145 West 57th Street, 10th Floor
New York, NY, 10019
(regarding the causation opinions expressed in his report)

Cynthia Kaplan, M.D. (plaintiff's placental pathology expert)
Stony Brook University Hospital
Department of Pathology, Level 2
100 Nichols Road
Stony Brook, NY 11794-7025
(regarding the opinions expressed in her report)

Dr. Julene Murage (regarding the facts and circumstances identified above)
Plainsboro, NJ
c/o United States and/or Henry J. Austin Center

33

Defendant, Nurse Richardson (regarding the facts and circumstances identified above)

Defendant, Nurse Cameron-Tini (regarding the facts and circumstances identified above)

Defendant, Nurse McGinnis (regarding the facts and circumstances identified above)

Defendant, Nurse Doohalak (regarding the facts and circumstances identified above)

Roman Tatarowicz, M.D.
7 Hopkinson Court
Titusville, NJ 08560
(regarding the facts and circumstances identified above)

Defendant-hospital's designated representative(s) concerning hospital policies, procedures, guidelines and/or protocols in effect during the subject time frame as they relate to obstetrical care and treatment of patients such as Ms. Smith and/or her unborn son, Sincere

Henry J. Austin Center/Clinic designated representative(s) concerning its policies, procedures, guidelines and/or protocols in effect during the subject time frame as they relate to obstetrical care and treatment of patients such as Ms. Smith and/or her unborn son, Sincere.

## B. On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

Tameika Smith (Plaintiff)
89 Sweets Street
Trenton, NJ 08618
(regarding the facts and circumstances identified above )

Lisa Bellamy (friend)
P.O. Box 743
Mooresville, N.C.28115
(regarding the facts and circumstances identified above)

Timothy Smith (relative)
132 Locust Street
Trenton, N.J. 08609
(regarding the facts and circumstances identified above)

Crystal Smith (relative)
132 Locust Street
Trenton, N.J. 08609
(regarding the facts and circumstances identified above)

Lois Sleming (friend)
132 Locust Street
Trenton, N.J. 08616
(regarding the facts and circumstances identified above)

Turquoise Jones (friend)
772 Pointe South Parkway, Apt. 1103
Jonesboro, GA 30238
(regarding the facts and circumstances identified above)

Channel Flowers (friend)
772 Pointe South Parkway, Apt. 1103
Jonesboro, GA 30238
(regarding the facts and circumstances identified above)

Terri S. Patterson, RN, MSN, (plaintiff's life care planning expert)
Nursing Consultation Services, Ltd.
1000 Germantown Pike, Suite D-1
Plymouth Meeting, PA 19462
(regarding the opinions expressed in her report concerning *e.g.* the nature, extent, cause, effect and permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

Daniel Adler, M.D., L.L.C. (plaintiff's pediatric neurology expert)
145 West 57th Street, 10th Floor
New York, NY, 10019
(regarding the opinions expressed in his report concerning *e.g.* the nature, extent, cause and permanency of Baby Sincere's injuries, limitations and disability; the past and future treatment required; life expectancy; and the cost of such treatment)

Michelle L. Murray, PhD, RNC (plaintiff's nursing and hospital liability expert)
9500 Montgomery NE, Suite 208
Albuquerque, New Mexico 87111
(regarding the opinions expressed in her report concerning *e.g.* causation of injuries and damages in part based on the extent of those injuries and damages)

35

J. Stephen Jones, M.D. (plaintiff's obstetrics and hospital liability expert)
4235 Minnesota Lane North
Plymouth, MN 55446
(regarding the opinions expressed in his report concerning *e.g.* causation of
injuries and damages in part based on the extent of those injuries and damages)

Andrew Verzilli, PhD/MBA (plaintiff's economics experts)
Verzilli & Verzilli and Consultants, Inc.
411 North Broad Street
Lansdale, PA 19446
(regarding the opinions expressed in their report concerning *e.g.* earning
capacity, lost earnings and cost of future medical care)

Marcus C. Hermansen, M.D. (plaintiff's neonatology expert)
14 Gregg Road
Nashua, NH 03062
(regarding the nature, extent, cause and permanency of Baby Sincere's injuries,
limitations and disability)

Cynthia Kaplan, M.D. (plaintiff's placental pathology expert)
Stony Brook University Hospital
Department of Pathology, Level 2
100 Nichols Road
Stony Brook, NY 11794-7025
(regarding the nature, extent, cause and effect of conditions and injuries in
utero)

Sandra Benanti, M.D.
Henry J. Austin Health Center
321 No. Warren St.
Trenton, N.J. 08618
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Barry N. Wasserman, M.D.
Campus Eye Group
1700 Whitehorse-Hamilton Square Road
Trenton, NJ 08690
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Representative(s) of Visiting Nurse Association of Mercer County
171 Jersey Street, Suite 201
P.O. Box 441
Trenton, NJ 08603
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Jan B. Wallack, M.D.
Robert Wood Johnson Medical School
1 Robert Wood Johnson Place
New Brunswick, NJ 08903
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Thomas A. Rugino, M.D.
Children's Specialized Hospital
94 Stevens Road
Toms River, NJ 08753
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Yen P. Chen, M.D.
Robert Wood Johnson University Hospital
125 Paterson Street, 6th floor
New Brunswick, NJ 08901
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Elizabeth Rose, M.D.
Newark Beth Israel Medical Center
Children's Hospital
201 Lyons Avenue at Osborne Terrace
Newark, NJ 0712
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

37

JenFu Cheng, M.D.
Children's Specialized Hospital
94 Stevens Road
Toms River, NJ 08753
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

Lois Sternberg, ST
Visting Nurse Association of Mercer County
171 Jersey Street
P.O. Box 441
Trenton, NJ 08603
(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

C.    **Defendant objects to the following witnesses for the reasons stated:**

**Defendants, Capital Health System at Mercer (Incorrectly Impleaded as CHS, Inc.
– Mercer Campus and/or d/b/a Capital Health System at Mercer), Michele
Doohaluk, RN (Incorrectly Impleaded as M. Doohala, RN), Kristen McGinnis,
RN, and Denise Richardson, RN's Objections:**

Defendant objects to the testimony of any witness listed by plaintiff not *NONE*
previously identified in responses to interrogatories served by defendant.

**Defendant United States objects to the following of Plaintiff's Witnesses:**
*FILE 2/20/08    OPPOSITION  2/25/08    NO REPLY*

Cynthia Kaplan, M.D. (plaintiff's placental pathology expert)  *WITHDRAWN*
Stony Brook University Hospital                                *SEE A 8 pg 4*
Department of Pathology, Level 2
100 Nichols Road
Stony Brook, NY 11794-7025
(regarding the opinions expressed in her report)

No report has been provided and leave of court has not been granted to produce
a report.

Defendant United States objects to the calling of any witness from Henry J.
Austin Health Center regarding protocols since Plaintiff has stated no contested
facts related to prenatal care.  Plaintiff has failed to present any expert report
that implicates protocols, treatment or procedures at Henry J. Austin Health
Center or that implicates the treatment received from care providers Saroya or

Miccio.  Such evidence is therefore irrelevant.

The defendant United States objects to any testimony from the following
witnesses except treatment given to Sincere Smith.  No expert reports were
provided in compliance with rule 26.

> Sandra Benanti, M.D.
> Henry J. Austin Health Center
> 321 No. Warren St.
> Trenton, N.J. 08618

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

> Barry N. Wasserman, M.D.
> Campus Eye Group
> 1700 Whitehorse-Hamilton Square Road
> Trenton, NJ 08690

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

> Representative(s) of Visiting Nurse Association of Mercer County
> 171 Jersey Street, Suite 201
> P.O. Box 441
> Trenton, NJ 08603

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

> Jan B. Wallack, M.D.
> Robert Wood Johnson Medical School
> 1 Robert Wood Johnson Place
> New Brunswick, NJ 08903

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's
injuries, limitations and disability; the required past and future care, treatment
and needs of Sincere and his mother with regard to Sincere; life expectancy; and
the cost of such care, treatment and needs)

> Thomas A. Rugino, M.D.
> Children's Specialized Hospital
> 94 Stevens Road
> Toms River, NJ 08753

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

> Yen P. Chen, M.D.
> Robert Wood Johnson University Hospital
> 125 Paterson Street, 6th floor
> New Brunswick, NJ 08901

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

> Elizabeth Rose, M.D.
> Newark Beth Israel Medical Center
> Children's Hospital
> 201 Lyons Avenue at Osborne Terrace
> Newark, NJ 0712

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

> JenFu Cheng, M.D.
> Children's Specialized Hospital
> 94 Stevens Road
> Toms River, NJ 08753

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

> Lois Sternberg, ST
> Visting Nurse Association of Mercer County
> 171 Jersey Street
> P.O. Box 441
> Trenton, NJ 08603

(regarding the nature, extent, cause, effect and/or permanency of Baby Sincere's injuries, limitations and disability; the required past and future care, treatment and needs of Sincere and his mother with regard to Sincere; life expectancy; and the cost of such care, treatment and needs)

**7. DEFENDANT'S WITNESSES** *(See instructions above).*

**A. On liability, defendant intends to call the following witnesses who will testify in accordance with the following summaries:**

**Defendants, Capital Health System at Mercer (Incorrectly Impleaded as CHS, Inc. – Mercer Campus and/or d/b/a Capital Health System at Mercer), Michele Doohaluk, RN (Incorrectly Impleaded as M. Doohala, RN),  Kristen McGinnis, RN, and Denise Richardson, RN's Liability Witnesses:**

1.     Jay Goldberg, M.D.
Dr. Goldberg shall testify that Nurses Richardson, Cameron-Tini, Doohaluk and other nurses provided care and treatment to Tameika Smith which was within accepted standards of care on July 5, 2001 and at all other times.  He will further testify that Tameika Smith experienced a concealed placental abruption prior to her arrival at the hospital on July 5, 2001 and it was prior to arrival at the hospital that neurologic injury occurred to Sincere Smith.  He shall testify that even if Sincere Smith had been delivered by 3:15 p.m. on July 5, 2001, the same neurologic outcome and the brain injury would have occurred.  Dr. Goldberg shall testify that Dr. Murage deviated from standard of care by failing to properly advise the nurses that her arrival would be delayed at the hospital and that she had a duty to advise the nurses that her appearance at the hospital would be delayed on July 5, 2001 and that she should have instructed the nurses to seek out another OB/GYN to assume care of the patient.  He shall testify that the fetal heart tracings did not change between Tameika Smith's admission to the hospital on July 5, 2001 and the bradycardia which appeared immediately prior to the Cesarean section.  Dr. Goldberg shall testify that the standard of care did not require the nurses to exercise chain of command and that the standard of care permitted the nurses to continue to monitor maternal and fetal status on July 5, 2001 in accordance with the Orders of Dr. Murage.  See report of Dr. Goldberg which is incorporated herein by reference.  Additionally, Dr. Goldberg shall testify as to his qualifications and the knowledge of the standard of care applicable to the defendant nurses on to the circumstances of this case. See Dr. Goldberg's Curriculum Vitae which is incorporated herein by reference.

2.     Thomas Westover, M.D.
Dr. Westover shall testify that Nurses Richardson, Cameron-Tini, Doohaluk and all other nurses complied with accepted standards of care in caring for Tameika Smith on July 5, 2001 and at all other times.  He shall testify consistent with the opinions expressed in his report dated January 8, 2008 and which is incorporated herein by reference.  Specifically, he will opine that Nurse Michelle Murray is incorrect in her opinions concerning the nursing care on July 5, 2001.  He will opinion that the nurses appropriately assessed Tameika Smith and advised Dr. Murage on a timely and complete basis of the patient's status and that the nurses properly followed Dr. Murage's orders and that there was no reason for the nurses to exercise chain of command.  Moreover, he shall testify that Tameika Smith probably experienced hypertension and protein urea at the time of her scheduled prenatal clinic appointment

of June 29, 2001 and that her severe PIH existed between June 29, 2001 and the morning of July 5, 2001. He will testify that Sincere Smith suffered a placental abruption and neurologic and brain injury prior to arrival at the hospital on July 5, 2001. He will opine that Tameika Smith was negligent in her failure to keep prenatal appointments and follow the directives of her physicians and the nurses who saw her on May 31, 2001, June 17, 2001 and June 23, 2001. Dr. Westover shall testify that Tameika Smith's non-compliance and failure to seek medical care in the days prior to presentation to the hospital on July 5, 2001 caused the neurologic injury of Sincere Smith. Dr. Westover shall testify that Tameika Smith did not have HELLP Syndrome on July 5, 2001. Dr. Westover shall testify as to his qualifications and his knowledge of the nursing standard of care as applied to the defendant nurses on July 5, 2001.

3.     Thomas Wiswell, M.D.

Dr. Wiswell shall testify that he is board-certified in pediatrics and neonatal/perinatal medicine and shall testify as to his qualifications as set forth in his Curriculum Vitae which is incorporated herein by reference. Dr. Wiswell shall testify that the etiology of Sincere Smith's brain injury was Tameika Smith's hypertension and preeclampsia as well as a concealed placental abruption and that the neurologic injury to Sincere Smith probably occurred 24 to 48-hours before his mother arrived at the hospital on July 5, 2001. He shall testify that the preexisting neurologic injury was evidenced by decreased fetal movement, the non-reactive fetal heart tracing upon arrival to the hospital on July 5, 2001, the mother's clinical status which established preexisting severe preeclampsia. He shall testify that Sincere Smith's clinical status in the hours and days following birth support his opinion that the brain injury occurred prior to Tameika Smith's arrival at the hospital on July 5, 2001, including but not limited to the fact that Sincere Smith did not have hypotonia that persisted for 36 to 48-hours, was initially flaccid and within hours after birth, his tone was described as normal or increased, his ten and five-minute Apgar scores were 4 and 6, respectively, which is inconsistent with an event occurring between 3:15 p.m. and 7:15 p.m. on July 5, 2001, nucleated red blood cells point to an injury to brain prior to arrival at the hospital on July 5, 2001 and that fact that Sincere Smith did not suffer classic multi-organ system damage including to the kidneys. He shall further rely upon the imaging studies, specifically the ultrasound of July 6, 2001 as well as the CT scans and rely upon the report of Dr. Zimmerman, which establishes that the brain injury occurred prior to Tameika Smith's arrival at the hospital on July 5, 2001. Moreover, he shall testify that findings of chorioamnionitis of the placenta were a contributing role to the child's brain injury. Dr. Wiswell shall testify that the opinions of Dr. Hermansen and Dr. Adler are incorrect to the extent they opinion that brain injury occurred after Tameika Smith's arrival at the hospital on July 5, 2001.

4.     Gerald Raymond, M.D.

Dr. Raymond shall testify in accordance with his Curriculum Vitae which is incorporated herein by reference and that he is a pediatric neurologist and research scientist at Krieger Institute in Baltimore, Maryland. Dr. Raymond shall testify in accordance with the opinions expressed in his report dated January 14, 2008. He will opinion that Sincere Smith's brain injury occurred prior to Tameika Smith's arrival at

the hospital on July 5, 2001 and was caused by a placental abruption which had occurred prior to arrival at the hospital. He will opine that Tameika Smith's preeclampsia preexisted her arrival at the hospital on July 5, 2001 by one or more days.

5.      Robert Zimmerman, M.D.

Dr. Zimmerman shall testify as to his qualifications which are incorporated by reference in his Curriculum Vitae. Dr. Zimmerman is a pediatric neuroradiologist specializing in evaluating the timing of hypoxic ischemic brain injury. He shall testify that the ultrasound examination of the brain performed on July 6, 2001 at 1:49 p.m. demonstrates to a reasonable degree of medical probability that the brain injury to this minor child occurred between 24 to 48-hours prior to the presentation of Tameika Smith to the hospital on July 5, 2001. His report and findings therein, dated January 11, 2008, are incorporated herein by reference and he shall testify to each and every opinion therein expressed. He shall testify that the pattern of injury to the minor child is consistent with a partial prolonged asphyxic type of injury.

6.      Charles B. Brill, M.D.

Dr. Brill shall testify as to his Curriculum Vitae which is incorporated herein reference. He shall testify that he is a pediatric neurologist who performed an examination of Sincere Smith on January 9, 2008 and that as a result of his neurologic injuries, Sincere Smith has a vastly diminished life expectancy with a life expectancy of 50% for between 5 – 10 years of additional years. He shall rely upon the literature supplied with his reports which are incorporated herein by reference. He shall testify that the severe neurologic and physical injuries of the minor plaintiff support his diminished life expectancy. The reports of Dr. Brill dated January 9, 2008 and January 23, 2008 are incorporated herein by reference and Dr. Brill shall testify in accordance therewith.

7.      Thomas Connolly.

Mr. Connolly is an economic expert witness who shall testify in accordance with the report of January 9, 2008 and the summary of his opinions to be expressed dated January 15, 2008. Mr. Connolly shall testify to his qualifications as an economic and annuity expert who shall testify that the cost of funding the proposed life care plan set forth by Nurses Patterson and Masterson can be funded through the purchase of annuities in the amounts of $3,982,659 and $4,649,028, respectively. Mr. Connolly shall opine that the diminished life expectancy articulated by Dr. Brill shall reduce the cost of annuities to fund the life care plan. Mr. Connolly's reports are incorporated herein by reference.

8.      Christine Cameron-Tini, R.N.

Nurse Cameron-Tini shall testify as to her nursing qualifications and shall testify that she was the triage nurse who received Tameika Smith at the hospital on July 5, 2001. She shall testify in accordance with her documentation in the medical records that she properly assessed maternal and fetal status and spoke with Dr. Murage on at least three occasions between 3:15 p.m. and 5:00 p.m. She will testify that she fully and completely informed Dr. Murage of fetal and maternal status and that Dr. Murage issued orders for patient care which Nurse Cameron-Tini followed properly. She will

testify that Dr. Murage advised her that she would appearing at the hospital within a reasonable time to evaluate maternal and fetal status. Among the facts she shall state is that she advised Dr. Murage in telephone calls that the fetal heart tracing was non-reactive, showed no long-term variability, had occasional decelerations, that the mother reported decreased fetal movement, that blood pressures were consistent with pregnancy induced hypertension, that maternal swelling was present, and that Dr. Murage was requested to come to the hospital to evaluate the patient. Nurse Cameron-Tini shall testify to those matters set forth in her deposition transcript. Nurse Cameron-Tini shall testify that there was no reason for her or any other nurse to exercise chain of command because she fully reported the patient's status to Dr. Murage, Dr. Murage responded with reasonable physician's orders and advised that she would be appearing at the hospital to evaluate the patient and because the maternal and fetal status did not change between 3:15 p.m. and approximately 6:30 p.m.

9.      Denise Richardson, R.N.
Nurse Richardson shall testify as to her qualifications as a Registered Nurse. She shall testify in accordance with the deposition testimony set forth in her transcript of June 28, 2007. She shall testify that she assisted with the care and treatment of Tameika Smith on July 5, 2001, that she spoke with Dr. Murage and requested that Dr. Murage appear at the hospital to evaluate the patient, that she received orders for hydralazine from Dr. Murage, that she instructed the nursing staff to place a telephone call to Dr. Murage at approximately 5:00 p.m. and that such a phone call occurred and Dr. Murage advised that she would be coming to the hospital soon. Nurse Richardson shall testify that there was no reason for the nurses to exercise chain of command with respect to Dr. Murage because the patient's status remained unchanged from 3:15 p.m. through approximately 6:30 p.m. on July 5, 2001.

10.     Michelle Doohaluk, R.N.
Nurse Doohaluk shall testify as to her qualifications as a Registered Nurse. Nurse Doohaluk shall testify in accordance with her deposition testimony of October 29, 2007. She shall testify that she received this patient for care and treatment at approximately 5:00 p.m. on July 5, 2001. She advised that Dr. Murage had been fully apprised of the patient's status as of 5:00 p.m. and that she learned that Dr. Murage was planning to come to the hospital to evaluate the patient. She will testify that she followed the orders of Dr. Murage to observe the patient while the patient was receiving magnesium sulfate and that there was no change in maternal or fetal status from 5:00 p.m. through approximately 6:30 p.m. She shall testify that at approximately 6:30 p.m. when a change in the fetal heart tracing occurred, she took steps to change the patient's position, administer oxygen and took other appropriate nursing interventions. She will testify that she also asked other nursing staff to simultaneously call Dr. Murage and request for her presence on a STAT basis and because of the changes in the fetal heart tracing. She will testify that Dr. Murage arrived at the hospital an orders for a code Cesarean section were issued which were followed appropriately. Nurse Doohaluk shall testify that she had no reason to exercise chain of command because she had received a report that Dr. Murage was aware of maternal and fetal status and had provided appropriate physician's orders and that there was no change in the maternal